**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| SARA IVY, ) | CASE NO. 4:10-cv-296 |
|     obo E. I., ) | |
| ) | |
|     Plaintiff, ) | JUDGE O'MALLEY |
| ) | |
|     v. ) | MAGISTRATE JUDGE |
| ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, ) | |
|     Commissioner of Social Security, ) | |
| ) | **REPORT & RECOMMENDATION** |
|     Defendant. ) | |

Plaintiff, Sara Ivy ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's son, E. I.'s (the "claimant"), application for Supplemental Security Income ("SSI") under XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* (The "Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

1

## I. PROCEDURAL HISTORY

On November 27, 2006, Plaintiff filed an application for SSI on behalf of the claimant, who was a child under the age of eighteen at all times relevant to this matter. Plaintiff alleged a disability onset date of April 14, 1999. The application was denied initially on May 9, 2007, and denied again upon reconsideration on November 26, 2007. On July 7, 2009, a hearing was held before an administrative law judge ("ALJ"). Although the claimant was present at the hearing with Plaintiff, only Plaintiff testified. On August 27, 2009, the ALJ found the claimant not disabled. On December 5, 2009, the Appeals Council declined to review the ALJ's Decision. On February 10, 2010, Plaintiff timely filed this action in federal court.

Plaintiff asserts one assignment of error: the ALJ erred in finding the claimant not disabled because the evidence supports the conclusion that the claimant is actually disabled.

## II. EVIDENCE

### A. Personal and Vocational Evidence

The claimant was born on April 14, 1999. (Tr. 103.) He was ten years old and entering the fifth grade at the time of his hearing before the ALJ. (Tr. 103, 35.) The claimant had never been engaged in substantial gainful activity. (Tr. 67.) He resided with his mother and four younger siblings at the time of the hearing. (Tr. 52-53.)

### B. Medical Evidence

Only the claimant's psychological condition is at issue. Essentially, Plaintiff alleges that the claimant displays disruptive and aggressive behavior that makes him

socially dysfunctional and, therefore, disabled.

In November 2006, Belmont Pines Hospital treated the claimant for three weeks as a "partial hospitalization" patient. (Tr. 177-98.) Dr. Krishna Devulapalli, M.D., treated the claimant and diagnosed attention deficit/hyperactivity disorder ("ADHD"). (Tr. 178.) The claimant received trial doses of Adderall, Concerta, and Focalin medications. (Tr. 179.) The claimant occasionally failed to take his Adderall and Concerta. (Tr. 185-88.)

Dr. Devulapalli noted that, although the claimant was hyperactive, he was able to follow the doctor's directions, did not express any thoughts of hurting himself or others, and did not suffer hallucinations or delusions. (Tr. 179.) Upon discharge, Dr. Devulapalli indicated that the claimant's condition had improved, and the claimant was scheduled for outpatient treatment at Family Service Agency. (Tr. 179.)

On March 23, 2007, Dr. David L. Chiarella, Ph.D., a pediatric psychologist, performed a child-parent clinical interview at the request of the Bureau of Disability Determination. (Tr. 199-201.) The claimant presented with his grandmother. (Tr. 199.) The claimant's grandmother described the claimant as "extremely mad," "extremely sad," "hyperactive," and "extremely evil." (Tr. 199.) However, the claimant presented with a positive physical appearance; casual, appropriate dress; and well-kept grooming. (Tr.200.) The claimant was cooperative and socially responsive, had a pleasant demeanor, and had no irritability or agitation. (Tr. 200.) His speech was clear, coherent, and relevant; and he was able to recall relevant information about himself, such as his birth date, address, and telephone number. (Tr. 200.) He was able to attend to conversation regarding various activities, was oriented, and denied hallucinations or delusions. (Tr. 200.) He denied being unhappy, upset, or angry, and

3

denied injuring himself. (Tr. 200.) He was able to relate adequately to Dr. Chiarella, maintain eye contact, and use verbal and non-verbal cues for social communication. (Tr. 200.)

Although the claimant's grandmother related a long history of the claimant's disruptive and aggressive behavior, the claimant was appropriate with a positive affect, had no signs of distress, and displayed an adequate ability to relate without any unusual or atypical behavior. (Tr. 200.) The claimant was socially responsive, and was never obstructive or oppositional. (Tr. 201.) Dr. Chiarella assigned the claimant with a Global Assessment of Functioning ("GAF") score of 58.[1]

On April 13, 2007, Katherine Lewis, Psy.D., a state agency psychologist, reviewed the claimant's medical and school records and evaluated his psychological and physical condition. (Tr. 203-08.) On May 1, 2007, Malika Haque, M.D., a state agency physician, also reviewed the claimant's records. (Tr. 203-08.) The doctors assessed the claimant's functional abilities in six domains of functioning as follows. The claimant had no limitation in the domain of moving about and manipulating objects. (Tr. 206.) He had less than marked limitations in the domains of acquiring and using information; interacting and relating with others; caring for himself; and health and physical well-being. (Tr. 205-06.) He had marked limitation in the domain of attending and completing tasks. (Tr. 205.) Drs. Lewis and Haque concluded that the claimant's

---

[1] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

impairments were severe but did not meet, medically equal, or functionally equal the Listings. (Tr. 203-04.)

In September 2007, Patricia Semmelman, Ph.D., a state agency psychologist, reviewed the claimant's medical records and stated that his grandmother's complaints about the claimant's behavior were not substantiated by the claimant's school records. (Tr. 228.) The claimant's teacher did not substantiate the claimant's alleged poor stress tolerance, impatience, irritability, or inability to relate to peers. (Tr. 228.) His teacher noted only less than marked problems with concentration and attention. (Tr. 288.) Although the claimant allegedly suffered eneuresis (incontinence of the bladder) and encopresis (incontinence of the bowels), his teacher reported no problems with bladder or bowel incontinence in school. (Tr. 228.)

From December 1, 2007 to September 5, 2008, the claimant received counseling at Family Service Agency. (Tr. 209- 26.) He was initially assigned a GAF score of 40.[2] (Tr. 230.) On September 5, 2008, the Agency indicated that its services were being terminated upon the request of the claimant because his goals were met and no additional services were needed. (Tr. 230.) Upon discharge, the claimant was assigned a GAF score of 55.[3] (Tr. 230.) The Agency indicated that the claimant had

---

[2] A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work. *See Diagnostic and Statistical Manual of Mental Disorders*, at 34.

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or

5

greatly improved functioning in school and in social settings, and that the claimant's Ohio Scales test showed he had significant improvement in social and academic functioning. (Tr. 230.)

On October 8, 2008, Dr. Iqbal, the claimant's treating pediatrician, reported that the claimant was doing well in school and had "no health or behavioral concerns." (Tr. 235.) Although the claimant continued to suffer eneuresis, it occurred less frequently than before. (Tr. 235.)

Between January and June 2009, the claimant received family counseling services with his mother, grandmother, and aunt at D & E Counseling Center. (Tr. 251-66.) The counselor who performed the claimant's intake on January 20, 2009,[4] indicated that the claimant had a GAF score of 45.[5] (Tr. 261.) At that time, the claimant's mother reported the following. The claimant was in the fourth grade, was attending regular classes, and had not repeated any grades. (Tr. 262.) His grades fluctuated up and down and, at that time, were down. (Tr. 263.) He acted disruptively during class as a "class clown," which required the claimant's teacher to change the

---

conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders*, at 34.

[4] The name of the counselor who performed the claimant's intake assessment at D & E Counseling Center is not legible on the assessment form. (See Tr. 266.) The assessment was reviewed, however, by therapist Rachel Biro, P.C., who performed several counseling sessions with the claimant and his family. (Tr. 266.)

[5] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental DisordersI,* at 34.

claimant's seat in class. (Tr. 263.) However, the claimant attended school regularly. (Tr. 263.)

The intake counselor indicated that the claimant made friends easily and got along well with neighbors and others at school, but that he did not get along well with his siblings.[6] (Tr. 265.) The counselor assessed that the claimant had average intelligence and normal thought processes. (Tr. 263.) The counselor observed that the claimant had a normal mood and affect; was hyperactive; had difficulty sitting still; and had difficulty listening to and following compound directions. (Tr. 263, 264.) The counselor indicated that the claimant was compliant, however. (Tr. 264.)

The claimant's mother reported that the claimant's mood changed rapidly when the claimant did not "get his way"; that the claimant became angry quickly; that the claimant was agitated; and that the claimant was oppositional. (Tr. 263.) Moreover, the claimant's mother reported that the claimant acted aggressively at home. (Tr. 263.)

The intake counselor indicated that it was unclear whether the claimant acted aggressively at school. (Tr. 263.) The claimant's mother reported that the school never called her regarding aggressive behavior and the counselor reported that, because of the lack of such telephone calls, the claimant's mother assumed the claimant was not acting aggressively at school. (Tr. 263.) The counselor also indicated that it appeared that the claimant's school was not reporting encopresis; however, he could not be certain because the claimant's mother was "inconclusive" regarding reports from the

---

[6] The intake counselor did not indicate, and it is not clear, whether the information regarding the claimant's ability to relate to and get along with others was reported by the claimant or the claimant's mother.

7

school. (Tr. 262.)

Therapist Rachel Biro, P.C., performed multiple counseling sessions with the claimant and his family at D & E Counseling Center and noted the contrast between the severity of the claimant's behavioral problems as reported by the claimant's mother and grandmother on the one hand, and the severity reported by the claimant's school and teacher on the other.[7] (Tr. 252, 253, 256, 257.) Ms. Biro discussed with the claimant and his family how the results of a Connor's assessment performed by the claimant's teacher, Ms. Biro's telephone conversations with the claimant's teacher, and observations made by the school reflected that the claimant did not suffer ADHD. (Tr. 253, 257.) The claimant's mother and grandmother accused the school staff of lying. (Tr. 252, 253, 257.)

In the Spring of 2009, the claimant's Ohio Reading, Math, and Writing Achievement Test Results indicated that the claimant performed reading at a limited level that did not meet the State's Grade 4 standards; performed math at a basic level that did not meet the State's Grade 4 standards; and performed writing at a basic level that did not meet the State's Grade 4 standards. (Tr. 249.)

From July through November 2009, the claimant, his mother, and grandmother attended counseling sessions at Churchill Counseling. (Tr. 267-88.) The counseling notes indicated that the claimant was not completing his school work, continued to fight

---

[7] It is not clear who from the school, other than the claimant's teacher, observed and reported on the claimant's behavior. It is also not clear whether other school staff members communicated with Ms. Biro directly, or whether the school's observations were reported to Ms. Biro by the claimant, the claimant's teacher, or the claimant's family.

8

with his siblings, and continued to become angry when his mother told him what to do. (Tr. 268-88.) The claimant's intake evaluation noted good memory and above average intelligence. (Tr. 288.) His thought process and content were normal. (Tr. 288.)

Mr. Justin Hernandes, M.S., LPC, a counselor at Churchill Counseling, performed an RFC assessment and indicated the following: the claimant had no problem moving about and manipulating objects (Tr. 239); had obvious problems interacting and relating with others (Tr. 238); had serious problems with acquiring and using information, and attending and completing tasks (Tr. 238); and had very serious problems with caring for himself (Tr. 239.) Mr. Hernandes did not assess the claimant's heath and well-being because he wanted a psychiatrist to perform that assessment. (Tr. 239.)

### C. Plaintiff's Hearing Testimony

The claimant did not testify at his hearing. Plaintiff testified to the following regarding the claimant. The claimant lived at home with his mother and four younger siblings. (Tr. 52-53.) The claimant's aunt, uncle, and grandmother helped Plaintiff raise the children when Plaintiff took the children to their home. (Tr. 53.) The claimant was disabled by his ADHD and Bipolar disorder. (Tr. 36.) The claimant suffered problems, which were later attributed to his mental disorders, since he was one year old. (Tr. 37.) The claimant was aggressive, threw tantrums over simple matters, and once dragged his brother down the stairs at home. (Tr. 37.) Plaintiff believed the claimant was trying to hurt his brother when he dragged him down the stairs. (Tr. 37.)

The claimant always yelled when he did not "get his way." (Tr. 43-44.) Sometimes, these tantrums were "extreme." (Tr. 48.) For example, if Plaintiff refused

9

to buy him something at the store, the claimant would begin to yell, cry, and throw things. (Tr. 48.) He did not calm down when Plaintiff told him. (Tr. 48.)

The claimant threw tantrums every day at home. (Tr. 50.) Plaintiff perceived these tantrums as mood swings, wherein the claimant would be calm and then suddenly become upset and appear angry. (Tr. 50.) Plaintiff described the claimant's behavior as similar to her three-year-old's behavior. (Tr. 49.) Only the claimant's uncle seemed able to control the claimant when the claimant threw tantrums. (Tr. 53.) Plaintiff indicated that the claimant's counselor attributed the claimant's tantrums to Plaintiff's poor parenting. (Tr. 48.)

Plaintiff did not think that the claimant's hospitalization at Belmont Pines helped the claimant. (Tr. 37.) At the time of the hearing, the claimant was obtaining counseling twice a month. (Tr. 38.) He was not taking medications at that time because his doctors wanted to reevaluate him before prescribing him any new medications. (Tr. 38.) His old medications made him drowsy, but did not help with his mental conditions. (Tr. 38.)

The claimant was entering the fifth grade in public school at the time of the hearing. (Tr. 39.) The claimant's fourth-grade teacher had to move the claimant to different seats periodically throughout the day because the claimant had difficulty sitting still and staying quiet. (Tr. 39.) The claimant did not receive any special education classes. (Tr. 39.) He was not enrolled in an Individualized Education Program ("IEP"), but Plaintiff had never discussed the option with the claimant's school. (Tr. 51.)

The claimant's reading ability was "pretty good," but his math skills were "iffy" and "so and so." (Tr. 40.) The claimant did not do his homework. (Tr. 42.) He occasionally

10

visited the school Principal's office because he did not listen to his teachers. (Tr. 42-43.) His teachers reported that he was bright, but that he did not listen to them. (Tr. 43.) The school had to call the claimant's home approximately five times because of trouble with the claimant. (Tr. 41.) Specifically, the claimant would become injured at school; apparently, he would suffer what the school would report as "accidents," such as a fellow student accidentally hitting him or pushing him down. (Tr. 41-42.)

The claimant was not sad, and did not isolate himself from others. (Tr. 50.) Moreover, he knew his "safety rules." (Tr. 50.) He made good choices in other areas of daily living, as well. (Tr. 51.) He had a few friends at school and related to them fairly well. (Tr. 44.) He treated his friends better than his siblings. (Tr. 44.)

The claimant did not have trouble feeding, bathing, or dressing himself. (Tr. 44.) He did not clean his room, however. (Tr. 45-46.) Moreover, he wet his bed at night and "poop[ed] his pants" every day. (Tr. 45.) Doctors were unable to identify why the claimant persisted in doing this. (Tr. 45.)

The claimant enjoyed playing football and was in the process of joining his school team. (Tr. 46.) He also enjoyed playing videogames. (Tr. 47.) He did not enjoy reading, however (Tr. 47), and although he was able to focus on playing videogames for extended periods of time (Tr. 51), he had trouble watching television for extended periods of time (Tr. 47).

### III.  STANDARD FOR DISABILITY

The Welfare Reform Act amended certain provisions of Title XVI of the Social Security Act relating to children's SSI applications. *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002). The Welfare Reform Act provides the

11

following standard for determining whether a child is disabled under the Social Security Act:

> An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine*, 37 F. App'x at 147. There is a three-step analysis for determining whether a child-claimant is disabled. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe." *Id.* Third, if the child suffers a severe impairment or combination of impairments, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *Id.*; *Miller ex rel. Devine*, 37 F. App'x at 148. If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled. 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on April 14, 1999. Therefore, he was a school-age child on . . . the date [the] application was filed, and is currently a school-age child.

2. The claimant has not engaged in substantial gainful activity since November 27, 2006, the application date.

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (hereinafter, "ADHD"), oppositional defiant disorder (hereinafter, "ODD"), eneuresis (bedwetting), and encopresis (incontinence of feces).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since November 27, 2006, the date the application was filed.

(Tr. 67-82.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.  Whether the Claimant Meets the Criteria for Disability Pursuant to the Functional Equivalence Standard

At the third step of the ALJ's disability analysis, the ALJ determined that the claimant's severe impairments did not meet, medically equal, or functionally equal an impairment in the Listings. Plaintiff argues that remand is necessary because the record evidence supports the conclusion that the claimant's severe impairments functionally equal an impairment in the Listings and, therefore, supports the conclusion that the claimant is disabled. For the reasons set forth below, the Court disagrees.

A child-claimant's severe limitations functionally equal an impairment in the Listings when those severe impairments cause "marked" limitations in at least two domains of functioning, or "extreme" limitations in at least one domain of functioning. 20 C.F.R. § 416.926a(a). There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) one's health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Here, the ALJ found that the claimant suffered "marked" limitations in only one domain: attending and completing tasks. (Tr. 78.) The ALJ found that the claimant suffered "less than marked limitations"

14

in acquiring and using information, interacting and relating with others, caring for himself, and regarding his health and physical well-being. (Tr. 77, 79, 81, 82.) The ALJ found that the claimant suffered "no limitation" in moving about and manipulating objects. (Tr. 80.)

Plaintiff argues that the record evidence shows the claimant suffers "marked" limitations in two other domains: interacting and relating with others, and caring for himself. Articulated another way, Plaintiff argues that substantial evidence supports the conclusion that the claimant suffers "marked" limitations in these two additional domains notwithstanding the ALJ's findings to the contrary. As discussed below, this argument is not persuasive because it employs the wrong standard. The issue is whether substantial evidence supports the ALJ's findings. If the ALJ's decision is supported by substantial evidence, it may not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512. For the reasons set forth below, the ALJ's Decision is supported by substantial evidence.

The ALJ found that the claimant suffered only "less than marked" limitations in his ability to interact and relate with others because, although the claimant allegedly displayed aggressive behavior toward his siblings, Plaintiff acknowledged that the claimant had friends at school; the claimant's teacher reported that the claimant did not have problems interacting with and relating to his peers; the Discharge Summary from Family Services indicated that the claimant was improving functionally in school and in social settings; and, at the time the claimant was reported to have made significant improvements, Dr. Iqbal almost contemporaneously reported that the claimant had no health or behavioral concerns. (Tr. 79.)

The ALJ found that the claimant suffered only "less than marked" limitations in caring for himself because, although the claimant allegedly suffered encopresis daily, there was no objective medical evidence to support this allegation; Plaintiff acknowledged that the claimant had no problems caring for himself; and school records did not mention that the claimant suffered incontinence of the bowels. (Tr. 81.)

Plaintiff has not explained how the evidence upon which the ALJ relied to conclude the claimant was only less than markedly limited in interacting and relating with others and caring for himself was inadequate. Indeed, the ALJ cited more than a scintilla of relevant evidence upon which a reasonable mind could accept as adequate to support his conclusions. Because substantial evidence supports the ALJ's Decision, the ALJ's Decision should be affirmed.

## VI. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of the Commissioner.

<div style="text-align:right">s/ <i>Nancy A. Vecchiarelli</i><br>U.S. Magistrate Judge</div>

Date: December 17, 2010

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981)**; *Thomas v. Arn*, **474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**